1  Joseph J. Tabacco, Jr. (SBN 75484)
   Todd A. Seaver (SBN 271067)
2  **BERMAN TABACCO**
   44 Montgomery Street, Suite 650
3  San Francisco, CA  94104
   Telephone: (415) 433-3200
4  Facsimile:  (415) 433-6382
   Email: jtabacco@bermantabacco.com
5          tseaver@bermantabacco.com

6  *Attorneys for Plaintiff Bogard Construction, Inc.*

7

8                  **UNITED STATES DISTRICT COURT**

9               **NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| BOGARD CONSTRUCTION, INC., on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| VITOL INC.; SK ENERGY AMERICAS, INC.; and SK TRADING INTERNATIONAL CO. LTD., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

CLASS ACTION COMPLAINT

Plaintiff Bogard Construction, Inc., on behalf of itself and all others similarly situated, brings this Class Action Complaint for damages, restitution, and injunctive relief against Defendants Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SK Energy"), and SK Trading International Co. Ltd. ("SK Trading")[1] (collectively "Defendants") for violations of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq*. ("Cartwright Act"), and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL").  All allegations herein other than those concerning the Plaintiff are based on information and belief.

## I.      NATURE OF THE ACTION

1.      This action is brought on behalf of Plaintiff Bogard Construction ("Plaintiff") and all California consumers, including businesses, organizations and entities as well as natural persons who purchased gasoline at retail in California anytime during the time period from February 18, 2015 through December 31, 2016 (the "Class Period").

2.       Competing gasoline trading firms Vitol, SK Energy, and SK Trading and certain of their employees consciously agreed to a common scheme throughout the Class Period jointly manipulating the spot market for gasoline formulated for use in California and in certain gasoline blending components used in that gasoline.  Their unlawful, concerted conduct to manipulate the spot price for gasoline violated California's Cartwright Act and Unfair Competition Law, and caused retail gasoline prices paid by Plaintiff and all California consumers to be higher than they would have been.  All told, California consumers have paid billions of dollars more at the pump than they would have absent the Defendants' unlawful conduct.

3.      On May 4, 2020, Defendants' conduct became known for the first time to Plaintiff and the Class when the California Attorney General filed a partially redacted complaint ("AG Complaint") against Defendants for violations of the Cartwright Act and the UCL.[2]

---

[1] SK Energy and SK Trading will be collectively referred to herein as "SK."

[2] The AG Complaint may be found at https://www.oag.ca.gov/system/files/attachments/press-docs/Scanned%20copy%20of%20redacted%20complaint%20as%20filed.pdf.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d) and 1367.

5. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District.  Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District.  The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## III. INTRADISTRICT ASSIGNMENT

6. Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the trade and commerce affected by Defendants' illegal conduct was substantially conducted with, directed to or impacted Plaintiff and members of the Class in counties located within the Division. The San Francisco spot market is located within this Division.

## IV. PARTIES

### A. Plaintiff

7. Plaintiff Bogard Construction, Inc. is a California corporation with its principal place of business in Santa Cruz, California and has been involved in a wide variety of healthcare, commercial, industrial, residential and other construction projects for over seventy years. Plaintiff purchased tens of thousands of dollars of gasoline at retail during the Class Period defined herein for its own use and not for resale.

**B.      Defendants**

8.      Defendant Vitol Inc., a Delaware corporation, is an energy company with its principal place of business at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098. Vitol is registered with the California Secretary of State to conduct business in California.

9.      Defendant SK Energy Americas, Inc. is a California corporation with its registered office at 1300 Post Oak Boulevard, Suite 425, Houston, Texas 77056.  Defendant SK Energy is an indirect, wholly-owned subsidiary of Defendant SK Trading.

10.      Defendant SK Trading International Co. Ltd. is a South Korean corporation with its head office at 26 Jongno, Jongno-gu, Seoul, South Korea.

11.      SK Trading is the indirect parent of SK Energy. SK Trading is also a sister company to SK Energy Co., Ltd. ("SK Energy Korea"), the largest refiner of crude oil in Korea. All of these entities are subsidiaries of SK Innovation Co., Ltd. ("SK Innovation"), a publicly traded holding company headquartered at 26, Jongno, Jongno-gu, Seoul, Korea.

12.      SK Trading publicly describes its subsidiary SK Energy as the marketing agent for SK Energy Korea in the United States and explains that SK Energy facilitates the export of SK Energy Korea's gasoline and gasoline blending products to the United States.

13.       SK Trading dominated and controlled SK Energy, and specifically ratified the illegal conduct engaged in by SK Energy that is described herein. SK Trading and SK Energy Korea list their headquarters at the same address as SK Innovation.

14.      At all times relevant to this Complaint, Defendant SK Energy was an agent and alter ego of Defendant SK Trading, due to the nature and extent of control that SK Trading exercised over SK Energy.

15.      At all times relevant to this Complaint, there existed a unity of interest and ownership between SK Energy and SK Trading such that any separateness between them had ceased to exist and SK Trading controlled, dominated, managed, and operated SK Energy. Specifically, SK Trading controlled the business and affairs of SK Energy such that the distinction between the companies were mere technicalities.

16.     Additionally, at all times relevant to this Complaint, SK Energy was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and ratification, either express or implied, of SK Trading in performing the acts alleged in this Complaint.

## V.     <u>AGENTS AND CO-CONSPIRATORS</u>

17.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

18.     Defendants' agents operated under the authority and apparent authority of their principals.

19.     Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

20.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

21.     Each Defendant acted as the principal, agent or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

22.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed the alkylate products discussed in this

Complaint, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## VI.   CLASS ACTION ALLEGATIONS

23.   Plaintiff brings this action for damages on behalf of itself and a class action of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rules23(a) and (b)(3), which is defined as follows (the "Class"):

> All California residents, including businesses, organizations, entities and natural persons, that purchased gasoline from a retailer within the State of California from February 18, 2015 through December 31, 2016 (the "Class Period").

24.   This definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; and (e) the judges and chambers staff in this case, as well as any members of their immediate families.

25.   Plaintiff does not know the exact number of Class members. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the State of California, such that joinder of all Class members in the prosecution of this action is impracticable.

26.   Plaintiff's claims are typical of the claims of its fellow Class members because Plaintiff purchased gasoline during the Class Period. Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

27.   Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

> a.   Whether Defendants contracted, combined or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period;

b. Whether Defendants' conduct caused the prices of gasoline sold at retail to be higher than the competitive level as a result of their restraint of trade; and

c. Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages.

28. These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

29. Plaintiff will fairly and adequately represent the interests of the Class because it purchased gasoline at retail within the State of California during the Class Period and it has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

30. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

31. This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

32. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII. FACTUAL ALLEGATIONS

### A. California's Gasoline Market

33. In 2015, over 15 billion gallons of gasoline were sold to California drivers.

34. Gasoline reaches consumers through a global supply chain that begins with extracting crude oil and transporting it to refineries, mostly via pipelines, marine tankers, and barges. At the refineries, crude oil is processed into gasoline and other petroleum products. Refined gasoline is then transported—again, usually via pipelines, marine tankers, and barges—

to storage terminals for wholesale distribution. From there, it is shipped by truck to retail gas stations where consumers fill their tanks.

35.     California is like an island when it comes to its finished gasoline market. Geographically the state is isolated from refining hubs in the rest of the United States. There are no pipelines that ship finished gasoline products into California. When local supplies are insufficient to meet demand in California, additional refined gasoline and gasoline blending components are typically brought into the state on marine vessels.

36.     California also has vehicle emissions standards that are more stringent than other areas of the country. Gasoline produced pursuant to these standards is called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB"). The CARBOB specifications are unique to California; therefore, gasoline used in neighboring states does not meet the CARBOB specifications and cannot be used as a substitute source of supply.

37.     Most of the CARBOB consumed in California is produced by refineries located in clusters near metropolitan centers in the San Francisco Bay Area and in the greater Los Angeles area.

38.     One of the largest refineries in Southern California is located in Torrance, California (the "Torrance Refinery"). The Torrance Refinery produces approximately twenty percent of all of the gasoline sold in Southern California (and ten percent of the statewide supply). The Torrance Refinery also has the capacity to produce significant quantities of alkylate, a high-quality gasoline blending component. In 2015, the Torrance Refinery was owned by ExxonMobil Corp. ("ExxonMobil").

39.     When unexpected supply disruptions occur, gasoline meeting California's unique CARBOB specifications must be sourced from outside of California. Deliveries can take several weeks to arrive at California's ports.

**B.     California's Gasoline Spot Market**

40.     "Spot" gasoline purchases refer to fuel that physically changes hands at a refinery gate or other major pricing hub for delivery on a pipeline or via barge or cargo. Deals are always done in bulk, typically 5,000 barrels (210,000 gallons) to 50,000 barrels (2.1 million gallons).

41.     There are a number of spot markets around the United States, but the two relevant to this litigation are located in San Francisco (for delivery to Northern California refineries located in the Bay Area); the other is in Los Angeles (for delivery to refineries in greater Los Angeles).

42.     The prices on the two California spot markets are influenced by gasoline prices on the New York Mercantile Exchange ("NYMEX"). Prices on the NYMEX are determined in a centralized market: there are typically thousands of gasoline trades on the NYMEX amounting to billions of gallons on every trading day. Further, all transactions on the NYMEX are publicly reported, so pricing is transparent to market participants.

43.     NYMEX prices generally reflect large-scale national and international factors, while the California spot markets react to the NYMEX price as well as regional and local supply and demand conditions. In many California spot market transactions, the buyer and the seller negotiate only the basis, and the final price is determined by adding the basis to the NYMEX price.

44.     "Rack" or "Wholesale" purchases are made along a fuel distribution system— usually at pipeline terminals. Transactions are conducted in approximately 8,000 gallon increments, the amount of fuel in a typical fuel truck. Companies that re-sell fuel (jobbers) as well as retailers or end users (*e.g.*, trucking companies) pull fuel from the wholesale racks. Wholesale rack prices move up or down each day at 6 p.m. Eastern Time, based on the movements of the spot market.

45.     Wholesale terminals are located throughout the State of California and are located in the following geographically dispersed cities: Bakersfield, Barstow, Brisbane, Carson, Chico, Colton, Eureka, Fremont, Fresno, Imperial, Los Angeles (three locations), Montebello, Orange, Richmond, Sacramento, San Diego, San Francisco, San Jose, Stockton, Van Nuys, and Wilmington.

46.     There are two common grades of CARBOB gasoline that are traded in the San Francisco and Los Angeles spot markets. Regular CARBOB ("Regular") is the most commonly traded grade of gasoline. Premium CARBOB ("Premium") is traded with far less frequency than

Regular. Premium trades at a higher price than Regular. Alkylate is a high-quality gasoline blending component that can be combined with other blendstocks to create Regular and Premium gasoline. Alkylates are critical to achieving the high-octane ratings of Premium gasoline advertised for sale at retail in California.

47.     Approximately 85% of gasoline sold at retail is "regular" gasoline. Another 10% is "premium" gasoline. The remainder is called "midgrade" gasoline. Refineries do not produce a midgrade gasoline blend; instead, the middle-octane option is blended at the fuel pump from a given gas station's supply of regular and premium gas.

48.     Unlike the NYMEX, spot market trades in California for both Regular and Premium are traded through non-public transactions, sometimes called over-the-counter ("OTC") trades. These OTC transactions do not occur on a centralized open exchange like the NYMEX, so prices on the California spot markets are not immediately public. Instead, refiners and traders rely on price-reporting services that report spot market prices from sources that participate in the market, such as traders, refiners, and brokers.

49.     The Oil Price Information Service, LLC ("OPIS") is the most widely used reporting service in California. OPIS is a subscription service that publishes a daily OPIS West Coast Spot Market Report (the "Spot Market Report"), which is the industry pricing benchmark used by both buyers and sellers in California. Subscribers to OPIS get the Spot Market Report and can also receive market updates from OPIS throughout the day that include reported deals and other industry news.

50.     The Spot Market Report includes, among other gasoline products, the prices for Regular and Premium gasoline contracts for prompt (*i.e.*, near term) delivery in Southern California and in Northern California. The Spot Market Report also contains forward prices for Regular and Premium gasoline.

51.     On a daily basis, there are usually many more Regular trades than Premium trades listed in the Spot Market Report. For example, there could be five, ten, fifteen, or more Regular trades reported on one day compared to one or no Premium trades. Because trading in

Premium is less common than Regular, a single Premium trade that is reported to OPIS tends to have a larger impact on the spot market price of gasoline than a single trade of Regular.

52.     The spot market is a critical link in the price influence chain because it sets the basis for cost-plus formula deals between suppliers and end users. It also forms the rationale for wholesale fuel price moves every day at 6 p.m. at wholesale racks across the U.S.—which then impacts price increases or decreases at the retail pump.

53.     The price chain between spot prices and retail prices is as follows:

NYMEX → Spot Market → Rack Market → Retail Market

54.     During the relevant period, Vitol was an active participant in trading gasoline in California. Vitol bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

55.     Vitol imported gasoline and gasoline blending components (such as alkylate) into California.

56.     Vitol employee Brad Lucas ("Lucas") held the title "USWC Trader." Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California.

57.     Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison also had trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to locations in the U.S. West Coast, including California.

58.     During the Class Period, SK was an active participant in trading gasoline in California. SK Energy bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

59.     SK imported gasoline and gasoline blending components (such as alkylate) into California.

60.     SK Energy employee David Niemann ("Niemann") was the senior trader responsible for executing trades on the U.S. West Coast, including California. Another SK Energy employee, Shelly Mohammed ("Mohammed"), held the role of gasoline scheduler and was Niemann's subordinate.

61.     SK Energy functioned as the California trading arm of SK Trading. While Niemann and Mohammed were nominally employees of Defendant SK Energy, SK's U.S. West Coast Trading Operation was conducted within the continuous and pervasive control and supervision of SK Trading and its subsidiaries, and SK Trading also specifically reviewed and approved key decisions to coordinate trading activities with Vitol.

**C.     Defendants' Concerted Manipulation**

62.     SK Energy hired Niemann in August 2014 and Niemann immediately began trading gasoline contracts on the California spot market. Before being hired by SK, Niemann held a similar role at Vitol for approximately ten years. Niemann and Lucas worked together at Vitol, and they maintained contact after Niemann was hired by SK Energy. Throughout the Class period, Niemann and Lucas communicated with each other by instant message, emails, telephone calls, and during in-person meetings, dinners, and drinks.

63.     "Fluid catalytic cracking" or "FCC" is an important part of refining crude oil. An FCC unit is a secondary refining unit that produces high-value products like alkylate.

64.     The Torrance Refinery's FCC unit produced a significant portion of all the high-octane alkylate produced in California. The alkylate produced at the Torrance Refinery was a key gasoline blending component for Premium gasoline produced in California.

65.     During the morning of February 18, 2015, there was a large explosion at the Torrance Refinery. The blast occurred in a part of the FCC unit.

66.     The Torrance Refinery was forced to shut down its FCC and reduce production of gasoline products, including alkylate, as repair efforts commenced. As a result of this unplanned outage at the Torrance Refinery—which did not end until approximately June 2016—ExxonMobil needed to replace a significant amount of lost alkylate production in California.

67.     Beginning at least as early as late February 2015, Vitol and SK Energy—through Lucas, Niemann, and others—reached agreements with each other and with third parties to raise, fix, and otherwise tamper with the price of refined gasoline in California by manipulating OPIS-reported prices in order to realize supra-competitive profits while limiting bona fide market risk. The explosion at the Torrance Refinery would act as cover for their illegal efforts to increase the price of gasoline on the California spot markets.

68.     Vitol and SK Energy specifically engaged in trades directly or indirectly between them that were reported to OPIS for the purpose of inflating the OPIS-published price for Regular and Premium gasoline. At times they used the services of an intermediary broker, and sometimes they transacted directly with each other.

69.     This conduct was designed to create the illusion of a supply/demand imbalance for refined gasoline and to drive spot market prices to artificial highs during strategic pricing windows.

70.     Many of these transactions were "leveraged" because they involved taking losses on the purchase of smaller quantities of gasoline to increase the profits on the sale of larger quantities of gasoline or alkylate.

71.     For example, Defendants traded Regular gasoline contracts directly or indirectly with each other at artificially high prices early in the trading day so that OPIS would report artificially inflated purchase price to other market participants. An early purchase during a strategic trading window at an inflated price signals a supply/demand imbalance to the market and thereby artificially inflates spot market prices.

72.     Defendants also executed market-spiking trades for Premium gasoline directly or indirectly with each other and third parties, and then reported these trades to OPIS. Because Premium gasoline trades were rare—often only zero or one of these trades were reported on any given day—these transactions had a significant impact on the spot market price.

73.     Defendants engaged in market-spiking spot trades for Premium gasoline to increase the OPIS-reported price for Premium during strategic pricing windows for large sales of alkylates. While alkylate is a key blending component for Premium gasoline, alkylate is not a

separately reported commodity on California's spot markets. Consequently, large price contracts for alkylate were most commonly tied, with a small differential, to the OPIS-reported spot price for Premium gasoline during the associated pricing window.

74. Defendants' manipulation of spot prices for Regular gasoline also affected alkylate contract prices because spot prices for Regular and Premium gasoline often move in tandem.

75. Therefore, to realize supra-competitive profits on alkylate contracts, Vitol and SK worked together to inflate the spot price of Regular and Premium gasoline during key pricing windows, and then coordinated their importation of alkylate into California at these supra-competitive prices.

76. Defendants also executed secondary offsetting or "wash" trades to hide or disguise their conduct, to limit or eliminate bona fide market risk on the reported trades, and to share their anticompetitive profits with each other. Defendants withheld disclosure from OPIS of these "wash" trades between them, or otherwise disguised them by transacting them through brokers or other third parties. These secondary trades were executed at the same time, before, or after the OPIS-reported trades.

77. A "wash trade" is a form of *fictitious trade* in which a transaction or a series of transactions give the appearance that authentic purchases and sales have been made, but where the trades have been entered without the intent to take a bona fide market position or without the intent to execute bona fide transactions subject to market risk or price competition.

78. By moving in the opposite direction of the reported trade, the secondary transaction ensured that there was little or no market risk associated with Defendants' overall conduct.

79. Defendants labeled their illegal agreements "joint ventures" or "JVs," but they were nothing more than secret agreements between purported competitors to artificially increase spot market prices for Regular and Premium gasoline in California. These agreements started out as verbal agreements and later were referenced in various writings. During the Class period,

Defendants' illegal conduct generated millions of dollars of profits for them per month, and Lucas and Niemann also financially benefitted as a result of their conduct.

80.     The price-spikes caused by Defendants' illegal conduct were not consistent with prior actual or perceived supply disruptions within California.

81.     Nor were the spot market price spikes explained by any actual decrease in gasoline production following the Torrance Refinery explosion. Even as aspects of the Torrance refinery remained off-line until June 2016, the refinery could still create finished gasoline from processed blending components, some of which was imported.

82.     Overall gasoline production in California was well within the historical five year production band immediately following the Torrance Refinery explosion and for the remainder of 2015.

83.     The Defendants' spot price manipulation, which was in full swing not later than February 2015, impacted CARBOB spot prices in both San Francisco and Los Angeles, whose markets move in tandem.

84.     Spot price manipulation increases the price of gasoline at all retailer distribution outlets, whether they supply branded or unbranded gasoline (*i.e.*, gas sold by retail discounters like Arco, Safeway, and Costco). In fact, prices for branded and unbranded gasoline move in tandem, with branded pricing slightly higher than unbranded pricing.

85.     No retailer in the State of California was spared cost increases caused by Defendants' misconduct, and empirical research demonstrates what industry participants have long known—that upstream wholesale price increases are quickly passed on to consumers, but that price declines lag.

86.     Indeed, while wholesale price increases are immediately passed through to retail gasoline price changes, wholesale price declines lag.

87.      The spot market sets the basis for cost-plus formula deals between suppliers and end users. It also forms the rationale for wholesale fuel price moves every day at 6 p.m. at wholesale racks across the U.S., including California—which then impacts price increases or decreases at the retail pump.

88.     Defendants' repeated manipulation of the spot market price caused retail gasoline prices to be higher throughout the class period.

89.     As demonstrated by the filing of the California Attorney General's Complaint against the Defendants on May 4, 2020, Senior Assistant Attorney General Kathleen Foote and her team of antitrust attorneys were able to continue with a non-public investigation into the causes of gasoline prices following the Torrance Refinery explosion and uncovered secret evidence that Defendants had illegally colluded with each other and third parties to increase the price of gasoline to levels above what competition would have allowed.

90.     The affirmative conduct underlying the illegal conduct alleged herein likely ended at or around the time that Niemann left SK Energy in late 2016.

## VIII.   TOLLING OF THE STATUTES OF LIMITATIONS

91.     Class member purchases of gasoline within four years prior to the filing of this Complaint are not barred by the applicable statutes of limitations and are not required to be tolled in order to be actionable.

92.     Plaintiff and the Class did not know of Defendants' illegal conduct until the California Attorney General filed its complaint against Defendants on May 4, 2020. Further, Plaintiff and the Class had no reason to believe that they paid prices for gasoline that were affected by Defendants' illegal conduct prior to that date, and thus had no duty to investigate the claims set forth in this Complaint until May 4, 2020. Defendants' secret joint venture agreements were inherently self-concealing.

93.     Additionally, Defendants engaged in affirmative conduct that was designed to mislead and conceal their illegal conduct. For example, Vitol's Lucas affirmatively mislead the California Energy Commission ("CEC") about the true cause of high prices for gasoline that followed the Torrance Refinery explosion in February 2015. On August 16, 2016, he told the California Energy Commission's Petroleum Market Advisory Committee ("PMAC"), including Kathleen Foote, Senior Assistant Attorney General and Chief of the Antitrust Division, that high gasoline prices were caused by a lack of transparency by ExxonMobil, rather than Defendants' illegal manipulation of spot market prices. Lucas stated:

So you know, last year we brought in quite a few cargos into L.A., both alkaloid (phonetic) and finish CARBOB that went through Kinder Morgan's system and sold direct to Exxon and some other refiners. You know, one of the big things that this whole conversation has entailed is about the high prices. One of the reasons why, in my opinion, was the lack of transparency with what was going on with Torrance. Because if you remember when it first blew up back in February, there was like an eternal rolling one-month period where they were going to get back up and running. And they kept saying next month, next month, next month. So the trading companies in general, it takes four to five weeks to ship a cargo out, if Exxon is coming back up they're not going to ship into closed ARB. So because there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there. That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again. So that's what happened with that one. So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see if it was more—if we were going to be able to land these cargos and actually into a competitive market. If Exxon is back up and running the market is going to fall dramatically. So basically kind of that lack of information kept cargos at bay. There were still a lot shipped into the West Coast, but not as many as could have been or would have been done. If we had actually known that Exxon was going to be down for over a year there would have been a much bigger import play over that time frame.[3]

94.     Moreover, Defendants repeatedly misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them, but concealing the existence of offsetting wash trades that reduced or effectively limited any market risk in the primary trade.

95.     Additionally, the California Attorney General, as representative of the people of the State of California, obtained tolling agreements with Defendants that are applicable to the claims of Plaintiff and the Class, in whole or in part. These tolling agreements have effective dates of August 3, 2018, and March 8, 2019, respectively. Defendants and the California Attorney General subsequently executed additional tolling agreements to extend the termination dates of the tolling periods specified in the original agreements. These termination dates have not passed as of the filing of this Complaint.

96.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four year statutes of limitations governing claims

---

[3] *See* https://www.energy.ca.gov/data-reports/planning-and-forecasting/petroleum-market-advisory-committee, August 16, 2016 Meeting Transcript at pp. 129:24-131:10.

under the Cartwright Act, and the UCL were tolled at least until May 4, 2020 pursuant to the injury-discovery rule, the doctrine of fraudulent concealment, and by virtue of express tolling agreements between the California Attorney General and Defendants.

## IX.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of the Cartwright Act**

**(California Business and Professions Code section 16720 *et seq*.)**

**(Against All Defendants)**

97.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

98.   Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of California Business and Professions Code § 16720 *et seq*. by artificially restraining competition with respect to the price of gasoline within the State of California.

99.   Defendants' activities constitute a per se violation of the Cartwright Act.

100.   Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiff and members of the Class are entitled to entitled to treble damages and injunctive relief pursuant to California Business and Professions Code § 16750(a).

### SECOND CAUSE OF ACTION

**Violation of the Unfair Competition Law**

**(California Business and Professions Code section 17200 *et seq*.)**

**(Against All Defendants)**

101.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

1    102.    Defendants committed acts of unfair competition, as described above, in violation

2    of the UCL.

3    103.    Defendants' conduct constitutes an "unlawful" business practice within the

4    meaning of the UCL, and includes, without limitation, the following:

5    •    Violating the Cartwright Act, as set forth above;

6    •    Engaging in wash sales and otherwise manipulating the benchmark prices

7         reported on the California gasoline spot market in violation of California

8         Corporations Code §§ 29535, 29536, 29537, 29538, and the Commodity

9         Exchange Act, 7 U.S.C. § 1 *et seq.*

10    104.    Defendants' conduct separately constitutes an "unfair" business practice within

11    the meaning of the UCL because Defendants' practices have caused and are "likely to cause

12    substantial injury" to the Plaintiff and the members of the Class that is not "reasonably

13    avoidable" by them.

14    105.    Defendants' conduct, as alleged herein, is and was contrary to public policy,

15    immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Any

16    purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the

17    victims of Defendants' conduct.

18    106.    Defendants' conduct is also "unfair" because it is contrary to numerous

19    legislatively-declared policies, as set forth in the Cartwright Act, the California Corporations

20    Code and in the Commodity Exchange Act. Here, Defendants' conduct not only violates the

21    letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The

22    conduct threatens an incipient violation of each of those laws and has both an actual and a

23    threatened impact on competition.

24    107.    Defendants' conduct, as described above, also constitutes a "fraudulent"

25    business practice within the meaning of the UCL. Defendants' trading activity on the California

26    gasoline spot market fraudulently raised the price of gasoline above the competitive level

27    through fictitious "wash" trades and other manipulative conduct that did not shift economic risk

28    for the transaction to an arm's length counterparty. This conduct was designed to deceive—and

did deceive—other market participants about the true supply and demand situation for gasoline in order to artificially increase the price of gasoline in California.

108.    Plaintiff and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for gasoline than they would have paid in a competitive market. They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code § 17203.

## X. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B.    Defendants have contracted, combined and conspired in violation of the Cartwright Act;

C.    Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

D.    Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

E.    Plaintiff and the Class are entitled to recover three-fold damages and/or restitution, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

F.    Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

G.    Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

   i.    A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

1        ii.     Issuance of a permanent injunction against Defendants and their parents,

2             subsidiaries, affiliates, successors, transferees, assignees and the

3             respective officers, directors, partners, agents, and employees thereof and

4             all other persons acting or claiming to act on their behalf from violations

5             of the law as alleged herein;

6    H.     Defendants are to be jointly and severally responsible financially for the costs

7          and expenses of a Court-approved notice program through post and media

8          designed to give immediate notification to the Class;

9    I.      Plaintiff and the Class recover their costs of this suit, including reasonable

10        attorneys' fees as provided by law; and

11    J.      Plaintiff and the Class receive such other or further relief as may be just and

12        proper.

## XI.   JURY TRIAL DEMANDED

14      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of

15 all the claims asserted in this Complaint that are so triable.

17 DATED:  May 13, 2020              **BERMAN TABACCO**

By:   */s/ Joseph J. Tabacco, Jr.*
         Joseph J. Tabacco, Jr.

Todd A. Seaver
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
Email: jtabacco@bermantabacco.com
      tseaver@bermantabacco.com

*Attorneys for Plaintiff Bogard Construction, Inc.*